UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JORDAN LUIS KILLENS,

               Petitioner,

      v.

HUNTER ANGLEA,

               Respondent.

Case No. 19-cv-02621-HSG (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

Petitioner, a state prisoner incarcerated at the Sierra Conservation Center, filed this *pro se* action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the validity of a conviction obtained against him in state court. ECF No. 1. Respondent has filed an answer, ECF Nos. 21-24, and petitioner has filed a traverse, ECF No. 29. The Court has carefully considered the briefs submitted by the parties. For the reasons set forth below, the petition is DENIED.

**PROCEDURAL HISTORY**

On March 23, 2015, the district attorney of Monterey County filed a second amended information against petitioner and co-defendant Richard Ravenesh Singh charging them with two counts of first-degree murder with gun enhancements and the special circumstance of lying in wait. ECF No. 21-5 at 10-15. On April 10, 2015, a Monterey County jury found petitioner guilty of the first-degree murder of Demetrius Isaiah Safford with the special circumstance of lying in wait, and found true multiple personal use of a firearm enhancement allegations. ECF No. 21-5 at 125-26, 132, 140-41. The jury found petitioner not guilty of the murder of Navneal Singh. ECF No. 2105 at 130, 133. On June 24, 2015, the trial court sentenced petitioner to life without the

possibility of parole plus 25 years to life.  ECF No. 21-6 at 18-19.  The jury found co-defendant Singh guilty of the first-degree murder of Safford and Navneal Singh with special circumstances of lying in wait, personal use of a firearm and multiple murder.  ECF No. 21-5 at 115-24, 137-39.

Petitioner appealed the judgment and filed a petition for a writ of habeas corpus in the California Court of Appeal.  On October 2, 2017, the Court of Appeal upheld the murder conviction and special circumstances enhancement but reversed and remanded for resentencing by striking the firearm enhancements under California Penal Code § 12022.53(d) and (e) and imposing a previously stayed firearm enhancement under California Penal Code § 12022.53(c).  Ex. 6; ECF 23-3 at 89-147, *People v. Singh, et. al.*, 2017 WL 4350360 (Cal. App. Oct. 2, 2017) (unpublished).  Also, on October 2, 2017, the Court of Appeal summarily denied the petition for a writ of habeas corpus.  Ex. 8, ECF No. 23-3 at 150.

Petitioner filed petitions for review of the appeal and for review of the denial of the habeas petition in the California Supreme Court.  Exs. 9, 10.  On January 17, 2018, the California Supreme Court denied review of the habeas petition.  Ex. 11, ECF No. 24 at 136.  On the same day, the Court granted review of the appeal and remanded to the California Court of Appeal with directions to vacate its decision and further consider it in light of California Senate Bill 620.  Ex. 12, ECF No. 24 at 138.  On February 26, 2018, the California Court of Appeal again affirmed the convictions, but reversed and remanded for resentencing for the trial court to consider exercising its discretion to strike the previously stayed California Penal Code § 12022.53(c) enhancement.  Ex. 13, ECF No. 24 at 140-201, *People v. Singh, et al.*, 2018 WL 1046260 (Cal. App. Feb. 26, 2018) (unpublished).[1]

On September 13, 2018, the trial court sentenced petitioner to 20 years consecutive to life without the possibility of parole.  Ex. 14, ECF No. 24-1 at 3-4.

On May 14, 2019, petitioner filed this federal petition for a writ of habeas corpus asserting the following claims: (1) admission of irrelevant and inflammatory evidence; (2) confrontation clause violation; (3) improper jury instruction; and (4) cumulative error.

---

[1] The 2018 opinion restated the same facts and claims analysis from the 2017 opinion.

United States District Court
Northern District of California

1

2

3

## BACKGROUND

The following factual background is taken from the February 26, 2018 opinion of the California Court of Appeal.[2]

4

5

6

7

8

> The victims, Demetrius Safford and Navneal Singh, FN 1, were shot and killed on the night of August 11, 2013, on the side of Dunbarton Road in Aromas.  Defendant Singh was convicted of both murders; defendant Killens was convicted of murdering only Safford.  The prosecution presented the testimony of two eyewitnesses to the murders: Ronald Saxton and Eric Romero, both of who had gone to the scene of the murder with defendants, believing they were going to participate in a home invasion robbery.

9

10

> FN 1: Because defendant Singh shares the same last name with one of the victims (Navneal Singh) and one of the witnesses (Reginald Singh), we use Navneal and Reginald's first names for clarity and not out of disrespect.

11

### A. Relationships

12

13

14

15

16

> Romero, one of the eyewitnesses, had known defendants since elementary school, and he had known Saxton since high school.  Saxton, the other eyewitness, had known defendant Killens, who was nicknamed "Liggz," since high school.  Saxton had met defendant Singh through defendant Killens a few months before the Navneal and Safford murders.  Saxton and defendants would "hang out" and smoke marijuana together. Saxton was the only one of the four who had a car—a black Lincoln.

17

18

> Victim Navneal lived in Sacramento.  Reginald Singh, defendant Singh's brother, became friends with Navneal in 2010.  Reginald introduced Navneal to defendant Singh.  Defendant Singh referred to Navneal as "cousin," even though they were not actually related to each other.

19

20

21

> On July 4, 2013, defendant Singh attended a birthday party for Reginald in Sacramento.  Romero and Saxton also attended the party.  Navneal attended a later party at a motel room with Reginald, defendant Singh, Romero, and Saxton.

22

### B. The Shooting–Initial Witnesses

23

24

> At about 9:47 p.m. on August 11, 2013, Yvonne Cortez and her husband, Luis Sanchez, were driving home on Dunbarton Road.

25

26

27

28

---

[2] The Court has independently reviewed the record as required by AEDPA.  *Nasby v. McDaniel*, 853 F.3d 1049, 1055 (9th Cir. 2017).  Based on the Court's independent review, the Court finds that it can reasonably conclude that the state court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, unless otherwise indicated in this order.  *Taylor v. Maddox*, 366 F.3d 992, 999–1000 (9th Cir. 2004), *overruled on other ground by Murray v. Schirro*, 745 F.3d 984, 999-1000 (9th Cir. 2014).

United States District Court
Northern District of California

They saw two cars parked on the side of the road and four people standing in between the cars. One car was a black Lincoln LS. One of the cars had its hood open, and the other car had its trunk open. Two men were facing the other two men.

A resident on Dunbarton Road heard 10 to 15 gunshots in rapid succession. Another area resident heard about five shots followed by three or four more shots. A third resident heard seven to nine shots.

At about 10:15 p.m., an off-duty deputy sheriff called 911 after seeing two bodies on the ground behind a car on Dunbarton Road. Another deputy was dispatched to the scene, where he saw the victims' bodies on the ground behind a gold Toyota sedan. The deputy observed bullet wounds to both victims' heads and bullet holes in the Toyota.

### *C. Investigation*

A detective was also dispatched to investigate the shootings. He located four .45-caliber brass bullet casings at the scene. Another detective found two additional .45-caliber casings the next day. A cell phone was found in the Toyota.

Forensic evidence technician Victor Lurz processed the vehicle. There was evidence of four bullet strikes to the vehicle, likely made by three bullets. A bullet was found near the right rear panel, and another bullet was found inside the car trunk.

About a year later, metal detectors were employed at the scene of the murder. Three more .45-caliber bullets were located at that time. The evidence—including a bullet found in Navneal's head and a fragment found in Safford's head—indicated that eight bullets had been fired.

An autopsy revealed that Safford had been shot in the back of the head. Bullet fragments were found in his skull. Safford had abrasions on his face that could have been caused by falling down and hitting his face on the ground. He also had a bullet wound in his back. The bullet had exited his chest. He had a third bullet wound in his right foot. A bullet had entered and exited one of Safford's shoes.

Navneal had been shot three times. He had an entrance wound in the back of his head, from which a bullet was extracted. A second bullet had entered his right lower back and had exited his abdomen. The condition of the exit wound indicated that Navneal had been pressing up against something or lying on the ground. A third bullet had entered Navneal's leg just below the knee and exited his thigh.

Forensic scientist Adam Lutz analyzed five bullets from the murder. It was highly likely that all five bullets, which were all full metal jacketed bullets, were fired from the same gun. The bullets included one taken from Navneal's skull. Lutz also analyzed seven casings from the murder. He concluded it was likely that all of the casings came from the same gun as well. However, he could not rule out the

possibility that there had been two guns because there was a potential eighth bullet strike.

Lutz had looked at the bullet fragments taken from Safford's skull. He described them as "very small lead fragments." It was possible, although "speculative," that the bullet fragments found in Safford's skull were from a different type of bullet—i.e., not a full metal jacket bullet. Lutz had not analyzed the bullet fragments with magnification or "the appropriate lighting," however, so he could not "give an opinion on that particular issue."

Defendant Singh did not attend Navneal's funeral. Prior to the funeral, Reginald asked defendant Singh if he had heard about Navneal's murder. Defendant Singh said he had no idea. At the funeral, Reginald got into an argument with his ex-girlfriend, Komal Prasad, who had had an affair with Navneal. Reginald told Prasad that he knew what had happened to Navneal and "who did it," and he told her that Navneal had been with defendant Singh on the night of the murders.

### D. Interview and Arrests of Defendant Singh

Defendant Singh was interviewed in late February 2014 at the Sheriff's Department. He received the *Miranda* warnings and agreed to talk. When asked if he knew about Navneal's murder, defendant Singh said he had heard about it from his brother Reginald, a few days after it happened. Defendant Singh had also seen news reports about the murders. Defendant Singh referred to Navneal as his "cus" or cousin.

Defendant Singh acknowledged that Navneal and Stafford had given him a ride from Sacramento to Monterey on the day of their murders. Defendant Singh said he had been dropped off at a smoke shop on Lighthouse Avenue between 1:00 p.m. and 3:00 p.m., and that Navneal and Stafford had told him they were going to go back to Sacramento. Defendant Singh then met up with a friend and went to Lovers Point, where he and the friend smoked marijuana. Defendant could not name the friend or say whether the friend was male or female. Defendant Singh denied communicating with Navneal, through text messages or calls, after being dropped off.

Defendant Singh was arrested for the murders after his interview but was subsequently released due to insufficient evidence. He was arrested again on July 15, 2014.

### E. Cell Phone Evidence

Cell phone and cell tower records showed that defendant Singh and Navneal had communicated at about 12:15 p.m. on the day of the murders and that they had traveled from Sacramento to Monterey at around the same time that day.

At 7:23 p.m., defendant Singh's phone was in Marina. At 7:57 p.m., he called Navneal while in Seaside. He made additional calls from Seaside and then received calls from Navneal at 8:11 p.m. and 8:22 p.m. Subsequent calls to and from Navneal indicated that defendant

5

United States District Court
Northern District of California

Singh was moving north into Castroville and then east towards Salinas. Defendant Singh received a call from Navneal at 9:25 p.m., a call from Saxton at 9:33 p.m., and a call from Romero at 9:41 p.m. At 9:42 p.m., defendant Singh's phone made an outgoing call that went through a tower on Dunbarton Road. He also received a call that went through the Dunbarton Road tower at 9:45 p.m. At 10:08 p.m., defendant Singh made a call that went through the Dunbarton Road tower, but by 10:11 p.m., he was moving south. By 10:19 p.m., he was in Salinas, and at 10:34 p.m., he was in Marina.

Saxton called Romero at 7:18 p.m. on the day of the murders. Saxton's calls around that time were made from Seaside and Marina, as he was moving north. At 9:33 p.m., Saxton called defendant Singh from a location in Salinas.

Romero, too, was in the Seaside area at 7:18 p.m. on the day of the murders. Romero received several calls from defendant Singh between 8:00 p.m. and 8:14 p.m., while Romero was still in Seaside. Romero's phone made a call through a tower on Crazy Horse Canyon Road in Salinas at 9:41 p.m., and it received a call from a tower on Dunbarton Road in Aromas at 9:42 p.m. Romero's phone next made a call from Salinas at 10:25 p.m.

Between June 3, 2013 and August 11, 2013, defendant Singh and Navneal had made 166 calls to one another. After 10:15 p.m. on the day of the murders, there were no calls between them.

Defendant Singh got a new cell phone number three days after the murder. Saxton's last phone call to defendant Singh was on September 17, 2013.

Kayana Jackson was the girlfriend of defendant Killens in August 2013. In September 2013, defendant Killens sent Jackson a text message: "You mean a lot to me. But remember when I told you I did something and I wish I could tell you?" Jackson wrote back, asking what defendant Killens had done. Defendant Killens responded: "Something that might fuck up our relationship. All I'm saying is what I did, I could be in jail for life and you don't deserve that." Jackson asked defendant Killens to tell her what he had done, but Killens indicated he would not do so over the phone.

In text messages the following day, defendant Killens again indicated he might tell Jackson what he had done. He also indicated that it might be "too real" for Jackson to understand.

About a week later, defendant Killens told Jackson he had shot and killed someone. Defendant Killens showed Jackson a gun that was in his bedroom dresser. The gun was a semiautomatic, "silver grayish" and "palm size."

Jackson was interviewed by the police in August 2014. Jackson told the police that defendant Killens had not talked to her about the murders. Upon further questioning, Jackson admitted that defendant Killens had told her he had shot or killed someone.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### F. Probation Search of Defendant Killens

On August 5, 2014, defendant Killens was under the supervision of the probation department with a search and seizure waiver. Probation officers conducted a search of his parents' home on that date. They examined defendant Killens's cell phone, including his text messages.

One outgoing text message to Jackson read, "I was taking a nap and my phone kept going off. They went to my granny's and said I had a warrant for the murder of two men. Delete these messages, all of them." Another outgoing message to Jackson read, "Na. That's stupid. All the freedom they're going to take from me. I'm staying out as long as I can." In response, Jackson asked, "Are they trying to get you for 25 years to [life]?" Defendant Killens's reply said, "Maybe. I don't know. Up to the judge."

The probation officers also opened up Facebook on defendant Killens's cell phone. An October 10, 2013 Facebook post by defendant Killens said, "I only fucc with a few niggas and all of em shoot niggas." An October 14, 2013 post by defendant Killens read, "My nigga said I got to have weed to fucc with him." Defendant Killens had "tagged" defendant Singh in that post as well as another one, dated October 13, 2013, which linked to a YouTube video. Defendant Singh had also tagged defendant Killens in a Facebook post dated November 6, 2013, which said, "just stop it my nigga it aint coo lol." On December 11, 2013, defendant Killens had posted, "Ask [defendant Singh] he'll tell you everything you need to know when I go in. Lol." On June 16, 2014, defendant Killens had tagged defendant Singh in a video post, which said, "This finna be ... fathers day ...... aint nobody was trying to dance with her she was humping everything but a nigga...." Defendant Killens had also accessed a Facebook link regarding the murders.

An August 5, 2014 Facebook message from defendant Killens to a person named Tran read, "I know shits crazy." The reply read, "He got caught with the same struzy you had?" Defendant Killens responded, "Sum like that." Tran's response asked, "Is he gonna drop a dime on you? Ha. Just kidding. The reply message from defendant Killens stated, "He already did." Another outgoing message from defendant Killens read, "It's bad for me right now. I'm trying to get to Hawaii." Other outgoing Facebook messages indicated that defendant Killens was "going to try to slide" (meaning leave) and that he needed to get out of the country.

Defendant Killens's cell phone also contained news articles regarding the arrest of defendant Singh for the murders of Navneal and Safford. The probation officers confiscated the cell phone.

### G. Saxton's Testimony

A detective located a black Lincoln LS at an apartment complex in Seaside on August 13, 2013. The Lincoln was registered to Ronald Saxton, who testified at trial under a grant of immunity.

7

A few weeks before the Navneal/Safford murders, Saxton was driving a car with defendant Singh. Saxton was arrested for possessing a gun, and he pleaded guilty, but at trial he claimed that the gun had actually belonged to defendant Singh.

On August 11, 2013, Saxton received a call from defendant Singh. Defendant Singh said he was coming down from Sacramento with his cousin and a friend. Saxton later exchanged text messages with defendant Singh, in which they discussed a plan to rob a house in Prunedale. Defendant Singh said a friend of his lived in the house and that there would be money and gold. Defendant Singh wanted Saxton to be the driver, and he wanted defendant Killens to come.

Saxton picked up defendants from the home of defendant Killens's grandmother. They then picked up Romero. While they were stopped for gas, defendant Killens said he had a gun and showed Saxton that he was carrying a gun, which appeared to be a revolver. Defendant Singh talked about meeting up with his cousin and a friend, who would be helping with the robbery. Defendant Singh said his cousin had a gun.

Defendant Singh directed Saxton to drive to Prunedale. They contacted a car that was stopped on a back road. Defendant Singh got out of Saxton's car and went inside the other car for a while, then returned to Saxton's car. Both cars then drove off, with Saxton's car in the lead and defendant Singh directing him where to go. On another back road, Saxton pulled the car over. The other car parked in front of him. Defendants and Romero exited Saxton's car, and two people—Navneal and Safford—got out of the other car.

Saxton watched the group talk and smoke cigarettes for a while. Romero then returned to Saxton's car. The others continued to talk. Navneal then took out a gun and passed it to defendant Singh.

After about 10 to 12 minutes, the group shook hands, and defendants walked back towards Saxton's car. Defendants then turned around and shot at Navneal and Safford, whose backs were turned. Navneal and Safford "dropped." Saxton heard about eight shots and believed that both defendants fired guns. Saxton described the gun that defendant Singh had used as a black gun with a big barrel—likely a .45–caliber.

After the shooting, defendants got back into Saxton's car. Defendant Singh told Saxton, "Go before I leave you here, too." Saxton drove defendants to Romero's neighborhood, where defendants and Romero got out of the car. The others instructed Saxton not to say anything.

Saxton stopped hanging out with defendant Singh after the murders, but he continued to have telephone contact with defendant Singh, in order to "keep it cool."

Saxton was arrested and interviewed five times about the murders. During the first three interviews, he did not tell the truth because he was scared of defendants. In the first interview, he denied having seen Navneal or Safford and denied having been to Dunbarton Road.

In the second interview, he admitted having driven defendant Singh to Dunbarton Road, saying he had given him a ride to a party. After Saxton was arrested and booked for being an accessory to murder, he told the police he had given defendant Singh a ride to meet his cousin on Dunbarton Road, and he told the police that defendant Singh had shot two people. After the police told Saxton that Romero was in custody, Saxton admitted that Romero had been present. Saxton later acknowledged that he had also driven defendant Killens to the scene of the murders, but he told the police that only defendant Singh had shot the victims. At the time, defendant Killens was still out of custody. Eventually, after hearing that both defendants were in custody, Saxton gave another statement, in which he told the truth: that both defendants had shot at the victims.

According to Monterey County Sheriff's Detective Martin Opseth, Saxton's first interview was on July 22, 2014. Saxton admitted knowing defendant Singh and Romero, and he admitted dropping defendant Singh off on Dunbarton Road, saying he believed defendant Singh was going to a party.

### H. Romero's Testimony

Romero was in a witness relocation/protection program when he testified at trial.

On the day of the murders, Romero went to go hang out with defendants and Saxton. The other three picked Romero up, and at some point they met up with another car, which started following them. Both cars pulled over, and defendant Singh got into the other car. Both cars then began driving again, with defendant Singh giving Romero directions over the phone, which Romero relayed to Saxton, the driver. Both cars eventually pulled off on Dunbarton Road. Saxton parked behind the other car, and everyone exited the cars except Saxton. Romero realized he had met one of the men from the other car about a month earlier, in Sacramento.

Romero, defendants, and the victims stood in a circle, smoking, outside of the cars. Defendants and the victims discussed plans for a home invasion robbery. Safford then pulled out a gun—a black semiautomatic, showed it to the others, and handed it to Navneal, who then handed it to defendant Singh. Defendant Singh checked the clip for bullets, then cocked the gun. Defendant Killens then pulled out a silver revolver and showed it to everyone. At that point, Romero returned to Saxton's car.

Romero saw defendants shake hands with the victims as if they were saying goodbye. The victims then began walking towards their car. Defendants then pulled out guns and shot the victims. The victims both "dropped," and defendants returned to Saxton's car.

Defendant Singh came back to Romero's house after the murders. Defendant Singh left after five or ten minutes, but returned later to spend the night. When defendant Singh returned, he no longer had the gun, but he had a "lump sum of money."

9

Romero continued to have contact with defendant Singh following the murders but slowly disassociated with him.  Romero had heard defendants "plotting on" Saxton after Saxton had "cut [them] off," and he was scared.  Romero acknowledged, however, that he was with defendant Singh in March of 2014 when the police stopped a car in which they were riding.  Romero was in possession of ecstasy and heroin at the time, leading to drug possession charges.

Romero was interviewed twice by the police.  During his first interview, on July 31, 2014, Romero told the police that he and Saxton had picked up defendant Singh from Dunbarton Road.  Romero denied being present during the murders or bringing defendant Singh to the site, and he denied knowing the victims.  Romero did not name defendant Killens: he was scared of defendant Killens, who was still out of custody.

During his second interview, on August 8, 2014, Romero named both defendants.  Defendant Killens was not in custody yet; he was arrested three days later.  No promises were made to Romero, but Detective Opseth did say he would try to help Romero by talking to the District Attorney about his pending cases.  At the time, Romero had pending charges involving possession of stolen property and possession for sale of narcotics.  The charges were dismissed after Romero testified at the preliminary hearing.

At trial, Romero admitted that some of his testimony at the preliminary hearing had not been "the full truth."  He had "misremembered."  For instance, he had previously testified that the group went to Salinas before going to Dunbarton Road, but he was no longer sure that was accurate.

### I. Defense Witnesses

Defendant Killens's mother testified that defendant Killens lived with her and his grandmother in Seaside during August 2013.  They moved to another Seaside residence in October 2013.

Shannon Langley was close friends with Safford and was living with him in August 2013.  On August 11, 2013, Safford left the house, then came back with Navneal.  Safford took his .45–caliber gun with him when he and Navneal later drove away.

*Singh, et. al.*, 2018 WL 1046260 at \*2-8.

## DISCUSSION

I.      **Standard of Review**

A petition for a writ of habeas corpus is governed by the Antiterrorism and Death Penalty Act ("AEDPA") under which a district court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C.

United States District Court
Northern District of California

10

1    § 2254(a).

2         A district court may not grant a petition challenging a state conviction or sentence on the

3    basis of a claim that was reviewed on the merits in state court unless the state court's adjudication

4    of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable

5    application of, clearly established Federal law, as determined by the Supreme Court of the United

6    States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in

7    light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v.*

8    *Taylor*, 529 U.S. 362, 412–13 (2000).  Additionally, habeas relief is warranted only if the

9    constitutional error at issue "'had substantial and injurious effect or influence in determining the

10   jury's verdict.'"  *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507

11   U.S. 619, 637 (1993)).

12        Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's

13   jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the

14   United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions

15   as of the time of the relevant state-court decision."  *Williams*, 529 U.S. at 412.  A state court

16   decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that

17   contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of

18   facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless

19   arrives at a result different from [its] precedent."  *Id.* at 405–06.  "Under the 'unreasonable

20   application' clause, a federal habeas court may grant the writ if the state court identifies the correct

21   governing legal principle from [the Supreme] Court's decisions but unreasonably applies that

22   principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal habeas court may not issue

23   the writ simply because that court concludes in its independent judgment that the relevant state-

24   court decision applied clearly established federal law erroneously or incorrectly.  Rather, that

25   application must also be unreasonable."  *Id.* at 411.  "A federal court may not overrule a state

26   court for simply holding a view different from its own, when the precedent from [the Supreme

27   Court] is, at best, ambiguous."  *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

28        When a state court rejects a federal claim without expressly addressing it, a federal habeas

11

*United States District Court*
*Northern District of California*

1  court must presume the federal claim was adjudicated on the merits and review the claim

2  deferentially under 28 U.S.C. § 2254(d).

3         The state court decision to which § 2254(d) applies is the "last reasoned decision" of the

4  state court.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991); *Barker v. Fleming*, 423 F.3d 1085,

5  1091–92 (9th Cir. 2005).  Petitioner first raised these claims in his appeal to the California Court

6  of Appeal.  The Court of Appeal's February 26, 2018 decision was the last reasoned state court

7  decision that addressed these claims.  Accordingly, in reviewing this habeas petition, this Court

8  reviews that appellate court decision.  *Ylst*, 501 U.S. at 803–04; *Barker*, 423 F.3d at 1091–92.

9  **II.     Petitioners' Claims**

10         **A.  Admission of Evidence**

11         Petitioner argues his constitutional rights were violated by the trial court's admission of his

12  Facebook posts and testimony that he was on probation at the time his home was searched.

13                **1. Legal Standard**

14         The admission of evidence is not subject to federal habeas review unless a specific

15  constitutional guarantee is violated or the error is of such magnitude that the result is a denial of

16  the fundamentally fair trial guaranteed by due process.  *Henry v. Kernan*, 197 F.3d 1021, 1031

17  (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986).  The Supreme Court "has not

18  yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a

19  due process violation sufficient to warrant issuance of the writ."  *Holley v. Yarborough*, 568 F.3d

20  1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic

21  materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an

22  unreasonable application of, clearly established Supreme Court precedent  under § 2254(d)); *see

23  also, Zapien v. Davis*, 849 F.3d 787, 794 (9th Cir. 2015) (because no Supreme Court case

24  established the fundamental unfairness of admitting multiple hearsay testimony, *Holley* bars any

25  such claim on federal habeas review).

26         Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis

27  for granting federal habeas relief on due process grounds.  *Henry*, 197 F.3d at 1031; *Jammal v.

28  Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).  While adherence to state evidentiary rules

United States District Court
Northern District of California

suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness. *Id.* The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995). But only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. *Jammal*, 926 F.2d at 920.

### 2. Admission of Facebook Posts

The California Court of Appeal described the challenged Facebook posts as follows:

> Defendants contend the trial court erred by allowing the prosecution to introduce the following six Facebook posts: (1) the October 10, 2013 post in which defendant Killens stated, "I only fucc with a few niggas and all of em shoot niggas;" (2) the October 14, 2013 post in which defendant Killens had "tagged" defendant Singh and stated, "My nigga said I got to have weed to fucc with him;" (3) the October 13, 2013 post that again tagged defendant Singh and linked to a YouTube video; (4) defendant Singh's post dated November 6, 2013, in which he had tagged defendant Killens and written, "just stop it my nigga it aint coo lol;" (5) the December 11, 2013 post by defendant Killens stating, "Ask [defendant Singh] he'll tell you everything you need to know when I go in. Lol;" and (6) the June 16, 2014 post in which defendant Killens had tagged defendant Singh in a video and stated, "This finna be . . . fathers day . . . . . . aint nobody was trying to dance with her she was humping everything but a nigga. . . ."

*Singh, et. al.*, 2018 WL 1046260 at *8.

The California Court of Appeal described the proceedings below on this issue as follows:

> In limine, the prosecution moved to admit two of defendant Killens's Facebook posts to show the close friendship between defendants. The two posts included the October 14, 2013 post in which defendant Killens had "tagged" defendant Singh and referenced "weed," and the October 13, 2013 post in which defendant Killens again tagged defendant Singh and linked to a You Tube video.
>
> Defendant Killens moved to exclude all Facebook posts. He argued that the potential prejudice of the posts would substantially outweigh "any minimal probative value."
>
> At the hearing on the motion, the prosecutor indicated he was seeking to introduce additional Facebook posts. He again argued that the posts were relevant because they showed defendants' association with one another. Defendant Killens asserted that some

13

of the posts were actually rap lyrics from a group called Niggas and argued that the posts had no probative value.

The trial court found that the October 10, 2013 Facebook post referencing shooting was "relevant and admissible," noting that the post was made "close enough in time to the shootings" to show defendant Killens's state of mind.  The trial court found that the October 13, 2013 post in which defendant Singh was "tagged" also showed the relationship between defendants; the court also found that the post's reference to "weed" was not "offensive" and did not imply that defendants were engaged in drug sales.  The trial court likewise found that defendant Singh's November 6, 2013 post (tagging defendant Killens) and defendant Killens's December 11, 2013 and June 16, 2014 posts (referencing and tagging defendant Singh) were relevant to show defendants' association.

*Singh, et. al.*, 2018 WL 1046260 at *8-9.

The Court of Appeal rejected this claim as follows:

Defendant Killens contends the Facebook posts amounted to bad character evidence and thus should have been excluded pursuant to Evidence Code sections 1101 and 352.  He concedes the Facebook posts were "arguably relevant" to show defendants' association with each other, but he contends the posts were cumulative of other evidence.  Defendant Killens asserts that the posts contained irrelevant "offensive and inflammatory language" that painted defendants as "gun[-]toting drug dealers or users, who denigrated women."  Defendant Killens contends the trial court's error in admitting the Facebook posts amounted to a violation of his federal constitutional rights to due process and a fair trial.

As an initial matter, we reject defendant Killens's argument that the Facebook posts were inadmissible under Evidence Code section 1101, subdivision (a).  The Facebook posts were explicitly offered to show the association between defendants.  The posts were not "offered to prove [defendant'] conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).)  Moreover, none of the Facebook posts resulted in the introduction of evidence of prior bad conduct, which is inadmissible to prove criminal disposition under Evidence Code section 1101, subdivision (a).  Although Killens referenced other people "shoot[ing] niggas" and referred to "weed," Killens did not indicate that he had ever shot someone or that he had ever used "weed."  Thus, "[t]he prohibition on the use of 'other crimes' evidence to prove character is not implicated here."

The Facebook posts were also not inadmissible simply because other evidence presented at trial ultimately helped establish the association between defendants. . . . As the Attorney General points out, the other evidence establishing defendants' association came primarily from Saxton and Romero, whose testimony was attacked by defendants as unreliable.  Thus, the Facebook posts had substantial probative value.

The trial court reasonably found the risk of undue prejudice from the Facebook posts did not substantially outweigh the posts' probative

United States District Court
Northern District of California

> value under Evidence Code section 352. . . . Although the Facebook posts contained the terms "nigga" and "fucc," our Supreme Court has observed that "[j]urors today are not likely to be shocked by offensive language." . . . Likewise, in light of the California electorate's legalization of marijuana for both medical and recreational purposes, the references to "weed" were not likely to inflame the jury. . . .
>
> We conclude the trial court did not abuse its discretion by admitting the Facebook posts.

*Singh, et. al.*, 2018 WL 1046260 at *9-11.

Although petitioner states here, as well as in the Court of Appeal, that his constitutional rights were violated by the admission of the Facebook posts, his arguments solely focus on state evidentiary law. As stated above, the due process inquiry in federal habeas review is whether the admission of evidence was so arbitrary or prejudicial that it rendered the trial fundamentally unfair. *See Walters*, 43 F.3d at 1357.

Under federal law, this claim is denied because the Supreme Court has not yet ruled that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant habeas relief. *See Henry*, 197 F.3d at 1031. Therefore, the Court of Appeal's rejection of this claim was not contrary to or an unreasonable application of Supreme Court authority.

Furthermore, as noted by the Court of Appeal and acknowledged by petitioner, most of the Facebook posts supported the inference that petitioner and his co-defendant Singh associated with each other and one post showed petitioner's state of mind near the time of the murders. Under *Jammal*, 926 F.2d at 920, the admission of any evidence which supports a permissible inference does not violate due process. Although petitioner argues that the Facebook posts should have been excluded because they were cumulative, he cites no Supreme Court authority for this contention. In any event, as noted by the Court of Appeal, the other evidence establishing the relationship between petitioner and Singh came from the testimony of Saxon and Romero, whose testimony petitioner attacked as unreliable. Therefore, the Facebook posts had significant probative value.

Finally, as the Court of Appeal indicated, the Facebook posts were not particularly inflammatory or prejudicial. Although the posts contained terms like "nigga" and "fucc," the

15

1    Court of Appeal was not unreasonable in concluding that these terms were unlikely to unduly

2    disturb modern jurors.  Neither was the jury likely to be prejudiced by the reference to "weed"

3    since the post did not infer that petitioner was selling it, and, in California, medical use of

4    marijuana had been legal since 1996, and recreational use of marijuana was common.[3]

5    .      For all these reasons, this claim does not warrant habeas relief.

6                    **3. Admission of Evidence That Petitioner Was on Probation**

7            Petitioner argues the admission of evidence that he was on probation at the time his home

8    was searched in August 2014 violated his right to due process because it was not relevant and was

9    prejudicial.

10           The Court of Appeal described the proceedings in the trial court on this issue as follows:

11                   In his trial brief, defendant Killens moved to exclude evidence that
                     he was on probation, arguing that the evidence was not relevant and
12                   would be unduly prejudicial.  He offered to stipulate that his
                     residence was lawfully searched.
13
                     During the hearing on motions in limine, the prosecutor argued that
14                   the evidence "obtained through that search" was "very probative"
                     and "far outweighed" any prejudicial effect of the jury finding out
15                   that defendant Killens was on probation.  The prosecutor argued that
                     the jury needed to know "the situation" because it is "highly
16                   irregular" to have an officer "come and do a search at somebody's
                     house."  Defendant Killens reiterated that he would prefer to "work
17                   on a stipulation."

18                   The trial court found that the evidence that defendant Killens had
                     been subject to a probation search was not "unduly prejudicial."
19                   The trial court found that the evidence was probative and that in
                     light of the charges defendant Killens was facing, the fact that he
20                   was on probation was "de minimis."

21                   During opening statements, the prosecutor told the jury that
                     defendant Killens's connection to the murder was discovered
22                   because he was "on probation with search and seizure terms," and
                     his probation officer searched his phone, finding news articles about
23                   defendant Singh's arrest and inculpatory text messages and
                     Facebook messages.  During his own opening statement, trial
24                   counsel for defendant Killens acknowledged that defendant Killens
                     was on probation for "joy riding in a car that didn't belong to him."
25

26    _____

27    [3] In California, medical use of marijuana was legalized by the Compassionate Use Act of 1996
      (Proposition 215) and recreational use of marijuana was legalized by referendum one year after
      petitioner's trial with the passage of the Adult Use of Marijuana Act of 2016 (Proposition 64).  *See*
28    https://post.ca.gov/proposition-64-the-control-regulate-and-tax-adult-use-of marijuana-act (last
      visited June 24, 2020).

United States District Court
Northern District of California

1    *Singh, et. al.*, 2018 WL 1046260 at *17.

2          The Court of Appeal rejected this claim finding that petitioner's probationary status was

3    relevant to show why his residence was legally searched on August 5, 2014 and knowing why the

4    search was conducted would ensure the jury would not speculate that he had committed another

5    crime. *Id.* at *18.

6          As discussed above, because the Supreme Court has not yet clearly ruled that admission of

7    irrelevant or overtly prejudicial evidence constitutes a due process violation, the admission of

8    petitioner's probationary status was not contrary to or an unreasonable application of Supreme

9    Court precedent. *See Holley*, 568 F. 3d at 1101.  Therefore, *Holley* bars this claim on federal

10   habeas review.

11         Furthermore, the evidence was relevant to show why a legal search was undertaken of

12   petitioner's residence and his cell phone and to prevent the jurors from speculating that there was

13   some other unknown reason for the search.  Although the issue of the search could have been

14   resolved through a stipulation that the search was legal, this would not have stopped the jurors

15   from speculating about the reason for it.  And any prejudice caused by the jurors' knowledge that

16   petitioner was on probation was diminished by defense counsel telling the jurors in his opening

17   statement that petitioner was on probation for joyriding, a relatively minor offense compared to

18   the charged offenses.  The admission of this evidence was not so arbitrary or prejudicial that it

19   rendered petitioner's trial fundamentally unfair.  *See Walters,* 45 F.3d at 1357.

20         Therefore, this claim does not warrant habeas relief.

21   **B. Confrontation Clause Claim**

22         The Court of Appeal summarized the claim and the proceedings in the trial court as

23   follows:

24              Defendant Killens contends the trial court erred by restricting his
                cross-examination of Romero—specifically, by not allowing
25              defendant Killens to elicit evidence that defendant Singh had a gun
                during the vehicle stop that led to Romero's drug possession
26              charges.  Defendant Killens argues that the trial court abused its
                discretion and violated his federal constitutional rights to confront
27              witnesses against him, to present a defense, and to due process.

28

United States District Court
Northern District of California

## 1. Proceedings Below

The prosecution's trial brief included a motion to admit evidence that defendant Singh was found in possession of a .380–caliber gun on March 28, 2014. The prosecution argued that the evidence would show that defendant Singh had disposed of the murder weapon. The prosecution also noted that the incident led to charges against Romero that were dismissed in exchange for his testimony at the preliminary hearing, and that the defense might seek to introduce the incident.

Before Romero testified, defendant Killens noted that Romero was likely to testify that he was scared of defendant Singh after the murders and had stopped hanging around with defendant Singh. Defendant Killens requested the trial court permit him to impeach Romero with evidence that on March 28, 2014, Romero and defendant Singh were together in the back seat of a vehicle that was stopped by police due to an expired registration. Upon smelling marijuana, the police searched the vehicle and found drug paraphernalia, ecstasy, and heroin. The police also found a loaded .380–caliber pistol in defendant Singh's possession.

Defendant Killens argued that the incident would "call[ ] into some question the veracity" of Romero's claim of being afraid of defendant Singh. The trial court put off ruling on the request.

On cross-examination, Romero acknowledged he was with defendant Singh when he was arrested for "dealing drugs." At that point, the trial court held a hearing outside the presence of the jury. Defendant Killens asked the trial court to allow him to "go into everything" about the incident, including the fact that defendant Singh was in possession of a loaded firearm.

Defendant Singh opposed introduction of the March 28, 2014 incident. He argued that his possession of the gun did not prove he had possessed or disposed of another gun on another occasion and that the evidence was more prejudicial than probative.

The prosecutor argued that the March 28, 2014 incident was relevant to show why Romero remained in fear of defendant Singh. Defendant Killens argued that the evidence would impeach Romero's testimony that he was afraid of defendant Singh because it showed that rather than trying to "distance himself" from defendant Singh, he was still "running around committing new criminal activity" with him.

Romero testified outside the presence of the jury, stating that he had initially been unaware that defendant Singh had a gun on March 28, 2014. When the police stopped their vehicle, defendant Singh had become nervous and had asked Romero to hold his gun, pulling it out of his pocket. Romero had not known the gun was loaded. Romero had seen defendant Singh with a gun on numerous prior occasions, but he was surprised that defendant Singh had a gun that day.

In ruling on the admissibility of the March 28, 2014 incident, the

1
2
3
4
5

> trial court noted that it was "considering the impact" to both
> defendants.  The trial court noted that Romero had already been
> impeached with prior statements and prior testimony, with "deals
> and dismissals of cases," with the fact that he had received money
> from the witness relocation program, with felony charges, and with
> his continued association with defendant Singh following the
> murders.  The trial court found that the March 28, 2014 incident
> would be prejudicial to defendant Singh but had "insignificant
> probative value" in terms of impeaching Romero.

*Singh, et. al.*, 2018 WL 1046260 at *14-15.

6
7
8
9
10
11
12

The Court of Appeal denied this claim based primarily on California Evidence Code section 352 and California case law.  In essence, the court found petitioner was able to impeach Romero with evidence having a significant impact on Romero's credibility other than the fact that, on March 28, 2014, Romero was in a car with Singh while Singh possessed a gun.  Based on this, the court concluded, "the trial court did not abuse its discretion by finding that the evidence would not have produced a significantly different impression of Romero's credibility and there was no violation of defendant Killens's confrontation rights."  *Id.* at *16.

### 1. Federal Authority

13
14
15
16
17
18

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment.  *Pointer v. Texas*, 380 U.S. 400, 403 (1965).

19
20
21
22
23

The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  *Crawford v. Washington*, 541 U.S. 36, 61 (2004). It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.  *Id.*; *see Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (noting a primary interest secured by the Confrontation Clause is the right of cross-examination).

24
25
26
27
28

However, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.  *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam).  Accordingly, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose

19

1    reasonable limits on such cross-examinations based on concerns about, among other things,

2    harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is

3    repetitive or only marginally relevant."  *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

4           A defendant meets his burden of showing a Confrontation Clause violation by showing

5    that "[a] reasonable jury might have received a significantly different impression of [a witness']

6    credibility . . . had counsel been permitted to pursue his proposed line of cross-examination."  *Id.*

7    at 680; *Slovik v. Yates*, 556 F.3d 747, 753 (9th Cir. 2009).  The focus of this inquiry "must be on

8    the particular witness, not on the outcome of the entire trial."  *Van Arsdall*, 475 U.S. at 680.

9           In a nutshell, a limitation on cross-examination does not violate the Confrontation Clause

10   unless it limits relevant testimony and prejudices the defendant, and denies the jury sufficient

11   information to appraise the biases and motivations of the witnesses.  *United States v. Urena*, 659

12   F. 3d 903, 907-908 (9th Cir. 2011).  To determine whether a defendant's Sixth Amendment right

13   of confrontation has been violated by the exclusion of evidence on cross-examination, a court

14   must inquire whether the evidence was relevant; whether there were other legitimate interests

15   outweighing the defendant's interests in presenting the evidence; and whether the exclusion of

16   evidence left the jury with sufficient information to assess the credibility of the witness.  *United*

17   *States v. Beardslee*, 197 F.3d 378, 383-84 (9th Cir. 1999), *amended,* 204 F.3d 983 (9th Cir. 2000).

18          Confrontation Clause claims are subject to harmless error analysis.  *United States v.*

19   *Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004) (post-*Crawford* case).  For purposes of federal habeas

20   corpus review, the standard applicable to violations of the Confrontation Clause is whether the

21   inadmissible evidence had an actual and prejudicial effect upon the jury.  *Hernandez v. Small*, 282

22   F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

23                          **2. Analysis**

24          The Confrontation Clause inquiry about exclusion of a witness's cross-examination is to

25   focus on that particular witness.  *See Van Arsdall*, 475 U.S. at 680.  More particularly, the court

26   must determine whether the evidence was relevant; whether other legitimate interests outweighed

27   the defendant's interest in presenting the evidence; and whether the jury had sufficient information

28   without the excluded evidence to assess the credibility of the witness.  *See Beardslee*, 197 F.3d at

United States District Court
Northern District of California

20

383-84.

The first *Beardslee* factor weighs in favor of petitioner because the excluded evidence, that co-defendant Singh had a gun when Romero was with him on March 28, 2014, was relevant to impeach the testimony of Romero by showing that Romero kept associating with co-defendant Singh even though Romero testified he was afraid of him after Romero witnessed the murders. However, as the trial court noted, the admission of evidence that co-defendant Singh had a gun in his possession months after the charged murders occurred would cause Singh substantial prejudice. Therefore, the second *Beardslee* factor weighs against petitioner because another legitimate interest was at stake. Whether that legitimate interest outweighed petitioner's interest in presenting the evidence is determined in conjunction with the third *Beardslee* factor, whether the jury had sufficient information to judge Romero's credibility without the evidence of the gun. As the Court of Appeal noted, Romero's credibility was impeached by other significant evidence, such as: (1) his prior inconsistent statements, *see* ECF No. 22-4 at 147–150; 184-85; ECF No. 22-5 at 41; (2) that he was testifying in exchange for dismissal of several felony charges against him, *see* ECF No. 22-4 at 155, 187-192; (3) that he was also testifying in exchange for receiving money from the government while he was in the witness protection program, *see* ECF No. 22-4 at 187; (4) that he was with co-defendant Singh on March 28, 2014 at the time of his arrest on drug charges, *see* ECF No. 22-5 at 107; and (5) between the time of the murders and March 28, 2014, Romero had seen co-defendant Singh numerous times, *see* ECF No. 22-5 at 107. In light of the many ways Romero was impeached, it is clear that the testimony about the gun would have added little to the jury's impression of Romero's credibility. Therefore, *Beardslee* factor three weighs against petitioner because the jury had sufficient evidence to question Romero's credibility without the gun evidence.

Furthermore, that the gun was not admitted into evidence did not have an actual and prejudicial effect upon the jury. *See Hernandez*, 282 F.3d at 1144. As discussed above, the gun evidence was tangential to the jury's determination of Romero's credibility. Furthermore, the prosecutor presented strong evidence against petitioner: the jury heard corroborating evidence from eyewitness Saxton that petitioner and co-defendant Singh shot the victims; telephone records

21

1    corroborated the eyewitnesses' testimony; and petitioner had made incriminating statements to his

2    girlfriend that he had shot someone.

3        Based on this record, the Court of Appeal's rejection of this claim was not contrary to or

4    an unreasonable application of Supreme Court authority.

5        **C.  Jury Instruction on Accomplice Testimony**

6        Petitioner argues the instruction on accomplice testimony, CALCRIM No. 334, violated

7    his Sixth Amendment right to an impartial jury trial because (1) it placed the burden on the

8    defense rather than on the prosecution to prove Romero and Saxton were accomplices, and (2) the

9    instruction required only "slight" corroborating evidence.

10       The Court of Appeal set forth the accomplice instruction the jury was given, CALCRIM

11   No. 334, as follows:

12           Before you may consider the testimony of Ronald Saxton or Eric
             Romero as evidence against Richard Singh and Jordan Killens, you
13           must decide whether Ronald Saxton or Eric Romero were
             accomplices to the crimes.  A person is an accomplice if he is
14           subject to prosecution for the identical crime charged against the
             defendant.  Someone is subject to prosecution if, one, he personally
15           committed the crime or, two, he knew of the criminal purpose of the
             person who committed the crime and, three, he intended to and did
16           in fact aid, facilitate, promote, encourage or instigate the
             commission of the crime.  The burden is on the defendants to prove
17           that it's more likely than not that Ronald Saxton or Eric Romero
             were accomplices.  An accomplice does not need to be present when
18           the crime is committed.  On the other hand, a person is not an
             accomplice just because he or she is present at the scene of the
19           crime, even if he or she knows that a crime will be committed or is
             being committed and does nothing [to] stop it.  A person may be an
20           accomplice if he is not actually prosecuted for the crime.

21           If you decide that a witness was not an accomplice, then supporting
             evidence is not required and you should evaluate his or her
22           testimony as you would for that of any other witness.  If you decide
             that a witness was an accomplice, then you may not convict the
23           defendant of murder based on his or her testimony alone.  You may
             use the testimony of an accomplice to convict a defendant only if,
24           one, the accomplice's testimony is supported by other evidence that
             you believe.  Two, that supporting evidence is independent of the
25           accomplice's testimony.  And three, that supporting evidence tends
             to connect the defendant to the commission of the crimes.
26           Supporting evidence however may be slight.  It does not need to be
             enough by itself to prove that the defendant is guilty of the charged
27           crimes.  And it does not need to support every fact about which the
             accomplice testified.  On the other hand, it is not enough if the
28           supporting evidence merely shows that a crime was committed or

22

> the circumstances of its commission.  The supporting evidence must tend to connect the defendant to the commission of the crime.  The evidence needed to support the testimony of one accomplice cannot be provided by the testimony of another accomplice.  Any testimony of an accomplice that tends to incriminate the defendant should be viewed with caution.  You may not, however, arbitrarily disregard it.  You should give that testimony the weight you think it deserves after examining [it] with care and caution and in light of all of the other evidence.

*Singh, et. al.*, 2018 WL 1046260 at *19; ECF No. 22-7 at 157-59.

This instruction was necessary because California Penal Code § 1111 provides, "a conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the crime."

The California Supreme Court has rejected petitioner's first argument, holding that the instruction does not improperly place the burden on defendants to prove a witness is an accomplice.  *See People v. Frye*, 18 Cal. 4th 894, 969 (1998) ("Courts have uniformly held that it is proper to allocate to the defendant the burden of proving that a witness is an accomplice."), *overruled on other grounds in People v. Doolin*, 45 Cal. 4th 390, 421, n.22 (2009).  This is because whether a witness is an accomplice is not an element of a crime that the prosecutor must prove beyond a reasonable doubt, but concerns the reliability of evidence used to convict a defendant of a criminal offense.  *Id.* at 968.

Because a federal habeas court may not question a state's determination of its own laws, the California Supreme Court's decision is binding on this court.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus."); *see also Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) (federal habeas relief unavailable for violations of state law).

Petitioner also argues that the instruction violated Supreme Court authority as established in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), which held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Apprendi*'s holding is limited to factors which could increase a defendant's sentence.  As the Court of Appeal correctly explained, *Apprendi* does not apply to this situation because:

> Accomplice corroboration does not expose a defendant to additional or increased punishment . . . The punishment for a defendant convicted of a crime is not affected by the fact that he or she was convicted by corroborated testimony from an accomplice or by other evidence.

*Singh, et. al.*, 2018 WL 1046260 at *20.

The California Court of Appeal's rejection of petitioner's *Apprendi* argument was not contrary to or an unreasonable application of Supreme Court authority.

Petitioner also argues that, under *People v. Betts*, 34 Cal. 4th 1039 (2005), the "slight" amount of evidence necessary to corroborate accomplice testimony violates *Apprendi* because Penal Code § 1111 presents a factual issue which the prosecutor must prove beyond a reasonable doubt. However, as the California Court of Appeal explained, "nothing in *Betts* casts doubt on prior California Supreme Court authority holding that a criminal defendant has the burden of proving that a witness is an accomplice by a preponderance of the evidence." *Singh, et. al.*, 2018 WL 1046260 at *20. As mentioned previously, this habeas court may not question a state court's interpretation of its own laws. *See Bradshaw*, 546 U.S. 76.

Citing *Arizona v. Fulminante*, 499 U.S. 279, 306-10 (1991), petitioner also argues the "slight" amount of corroboration required in CALCRIM 334 constitutes structural trial error because it makes it difficult to prove prejudice in the event a reviewing court determined his constitutional argument was valid.

*Fulminante* reviewed cases in which the constitutional violations were of rights "so basic to a fair trial that their infraction can never be treated as harmless error." *Id.* at 308. Some of these rights include the right to counsel, the right to an impartial judge, the right to self-representation at trial and the right to a public trial. *Id.* at 308, 310, n.8. The Court held that each of these constitutional deprivations creates a structural defect that affects the framework within which the trial proceeds, and is not simply an error in the trial process. *Id.* at 310. However, in ruling on the issue before it, the Court held that the admission of an involuntary confession did not constitute structural error and was subject to the harmless error analysis. *Id.* at 311-12.

Petitioner's argument about the "slight" amount of evidence needed for corroboration fails for two reasons. First, it is moot because, as stated above, the jury instruction on accomplice

1  testimony was not given in error.  Second, petitioner provides no authority for his argument.

2  Therefore, the state court's rejection of this claim was not contrary to or an unreasonable

3  application of Supreme Court authority.

4        **D. Cumulative Error**

5        Petitioner argues the cumulative prejudice from the alleged constitutional violations

6  establishes that he did not receive a fair trial.

7        In some cases, although no single trial error is sufficiently prejudicial to warrant reversal,

8  the cumulative effect of several errors may still prejudice a defendant so much that his conviction

9  must be overturned.  *Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003).  However, where

10  there is no single constitutional error existing, as in this case, nothing can accumulate to the level

11  of a constitutional violation.  *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011).  This claim is

12  denied.

13        **E. Ineffective Assistance of Appellate Counsel**

14        In his traverse, petitioner argues for the first time a claim of ineffective assistance of

15  appellate counsel based on the fact that the appellate briefings "all refer to the co-defendant rather

16  than Petitioner Killens—who was entitled to a separate state appeal instead of mixed into briefs

17  not even naming Petitioner Killens' ground for reversal of his conviction."  He argues, "It is not

18  possible to fathom precisely how even Petitioner became lawfully convicted, and without that

19  theory, it cannot be said the state court was reasonable in affirming his conviction."

20        Because petitioner has not submitted this claim to the state courts, it is unexhausted.  If

21  available state remedies have not been exhausted as to all claims, the district court must dismiss

22  the petition.  *Rose v. Lundy*, 455 U.S. 509, 510 (1982); *Guizar v. Estelle*, 843 F.2d 371, 372 (9th

23  Cir. 1988).  Where the allegations fail to raise a colorable federal claim, however, the claim may

24  be denied without reaching the exhaustion issue.  *See* 28 U.S.C. § 2254(b)(2); *Cassett v. Stewart*,

25  406 F.3d 614, 623-25 (9th Cir. 2005) (a federal court may deny an unexhausted claim on the

26  merits when it is clear that the applicant does not raise a colorable federal claim); *Granberry v.*

27  *Greer*, 481 U.S. 129, 135 (1987) (same).

28        Claims of ineffective assistance of appellate counsel are reviewed according to the

United States District Court
Northern District of California

standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Moormann v. Ryan*, 628 F.3d 1101, 1106 (9th Cir. 2010). First, the petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue. *Smith*, 528 U.S. at 285; *Moormann*, 628 F.3d at 1106. Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal. *Smith*, 528 U.S. at 285-86; *Moormann*, 628 F.3d at 1106

A review of petitioner's state appellate brief, attached as an exhibit to this petition, and the Court of Appeal's opinion show that this claim of ineffective assistance of appellate counsel is not colorable. First, the state appellate brief filed by appellate counsel addressed only petitioner's claims, not the claims of his co-defendant. The claims were well-researched and well-argued. Petitioner does not assert that appellate counsel failed to discover and brief a merit-worthy issue. Therefore, petitioner has not shown that appellate counsel's performance was objectively unreasonable.

Second, although petitioner's co-defendant's name appears in the title of the Court of Appeal's opinion, the opinion clearly delineates the arguments raised by petitioner from the arguments raised by his co-defendant. For instance, even though both petitioner and co-defendant Singh submitted claims based on Facebook posts, their arguments were about different postings and the Court of Appeal analyzed them separately. *Singh, et. al.*, 2018 WL 1046260 at *8-14. Petitioner, not his co-defendant, brought a Confrontation Clause claim based on petitioner's inability to cross-examine eyewitness Romero. The Court of Appeal identified this claim as petitioner's argument and analyzed it in a separate section from other claims. *Id.* at *14-16. Furthermore, petitioner, not his co-defendant, claimed his constitutional rights were violated by the admission of evidence that he was on probation. The Court of Appeal identified this claim as petitioner's argument and analyzed it in a separate section. *Id.* at *17-18.

Petitioner has failed to show that the state court was "unreasonable in affirming his

United States District Court
Northern District of California

conviction" based on appellate counsel's alleged deficient conduct or that, but for counsel's behavior, it is reasonably likely he would have prevailed on his appeal.  Therefore, petitioner has failed to show prejudice from appellate counsel's allegedly deficient conduct.

This claim is dismissed because it is not a colorable claim.

## III. Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  *Id.* § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Petitioner has not made such a showing, and, accordingly, a certificate of appealability is denied.

### CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated:  11/16/2020

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California